UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEVEN WASHINGTON,

    Plaintiff,

v.

MACOMB COUNTY, DEPUTY
JAMES ONYSKI, and DEPUTY
ANTHONY STONE, jointly and
severally,

    Defendants.
_____/

CASE NO. 06-12184
HON. LAWRENCE P. ZATKOFF

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on July 24, 2007

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

This matter is before the Court on Defendants' Motion for Partial Summary Judgment (Docket #12). Defendants filed their motion on May 7, 2007, and Plaintiff responded on June 11, 2007. Defendants have not filed a response. The Court finds that the facts and legal arguments are adequately presented in the parties' papers and the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. LR 7.1(e)(2), it is hereby ORDERED that the motion be resolved on the briefs submitted. For the following reasons, Defendants' Motion for Partial Summary Judgment will be GRANTED.

## II. BACKGROUND

This claim is brought pursuant to 28 U.S.C. § 1983. During the early morning hours of

November 9, 2005, Defendants, Deputies James Onyski and Anthony Stone (Onyski and Stone, respectively), were en route to investigate an abandoned home on Beyne Street in Mt. Clemens, Michigan, when they came into contact with Plaintiff. (*See* Stone Dep. at 6-10). According to Plaintiff, he had just left his friend's home on Beyne Street and sat down in the car he was driving that night.[1] (*See* Pl.'s Dep. at 12). Plaintiff, who had been drinking heavily at a bar earlier than night, had been in his car for less than a minute when he saw one of the deputies drive by in the opposite direction in a Macomb County Sheriff's vehicle. (*See id.* at 12-13, 52). After the Sheriff's vehicle passed Plaintiff, it immediately turned around and stopped behind him with its overhead lights on. (*See id.* at 12, 16).

While Plaintiff was seated in his vehicle, one of the deputies[2] approached his driver's side window and asked to speak with him. (*See id.* at 18-19). Because he could not roll down the car window, Plaintiff opened the driver's side door. (*See id.*). After opening the door, Deputy Stone asked Plaintiff to produce his driver's license, which Plaintiff failed to do. (*See* Stone Dep. at 10). Deputy Stone stated that once Plaintiff failed to produce a driver's license he was placed under arrest and asked to exit the vehicle. (*See id.* at 10-11). Deputy Stone, assisted by Deputy Onyski, then led

---

[1]Plaintiff's version of events differs significantly from the version recounted by both Onyski and Stone. Where the facts are in dispute, the Court must accept Plaintiff's version for purposes of this motion. According to the deputies, they were proceeding south on Beyne in a single file line with Deputy Stone following Deputy Onyski in a separate vehicle when they observed Plaintiff driving north on Beyne with no headlights on. (*See* Stone Dep. at 6-9). Plaintiff then swerved to avoid a collision with Onyski's vehicle and stopped near the curb. (*See id.*). Onyski stopped his vehicle facing south approximately ten feet behind Plaintiff's rear bumper and officer Stone stopped immediately next to Plaintiff's vehicle. (*See* Onyski Dep. at 10-12). Deputy Gennette, who was dismissed from this case by a stipulation of the parties, was stopped in a third car immediately behind Deputy Stone. (*See id.*).

[2]Although Plaintiff does not know which Defendant approached his car, the record shows that Officer Stone did so. (*See* Stone Dep. at 8; Onyski Dep. at 12).

2

Plaintiff to the rear of his vehicle where he was patted down and placed in handcuffs. (*See* Onyski Dep. at 12-13). After securing Plaintiff, the deputies escorted him to Onyski's patrol car. (*See id.* at 13). According to Plaintiff, one of the deputies opened the rear door of the patrol car, turned Plaintiff around, punched him in the stomach one time, and sat him in the back seat of the car.[3] (*See* Pl.'s Dep. at 22-23). Then Deputy Onyski administered a field sobriety test, which Plaintiff admitted to failing, and asked Plaintiff if he would take a preliminary breath test, which Plaintiff did. (*See id.* at 18, 26; Onyski Dep. at 15). Thereafter, Deputy Onyski left the scene of the arrest with Plaintiff, and Deputy Stone stayed behind to search Plaintiff's vehicle and await a tow truck. (*See* Onyski Dep. at 16; Stone Dep. at 14-15, 24-25).

While in the back seat of Deputy Onyski's vehicle on the way to the Macomb County Jail (MCJ), Plaintiff told Onyski that his stomach hurt and he needed help. (*See* Pl.'s Dep. at 25). Plaintiff states that Deputy Onyski did not respond.[4] (*See id.*). In the garage of the MCJ, Onyski removed Plaintiff's handcuffs, made Plaintiff empty his pockets and conducted another pat down search. (*See* Onyski Dep. at 17). Once inside the MCJ, Onyski turned custody of Plaintiff over to the MCJ correctional staff at which point the booking officer conducted another pat down search, *see id.* at 7, and Plaintiff told the booking officer, in Onyski's presence, that his stomach hurt and he needed help, *see* Pl.'s Dep. at 29-30. According to Plaintiff, the booking officer asked him what

---

[3] The Court finds it interesting that while Plaintiff's complaint alleges the Defendants "unjustifiably and with malice and wanton, beat, struck, kicked and hit" him, Pl.'s Compl. ¶ 4, he made it very clear at his deposition that he was only hit once, *see* Pl.'s Dep. at 22-23. The Defendants deny punching Plaintiff. (*See* Stone Dep. at 33-34; Onyski Dep. at 27-28).

[4] Plaintiff has no recollection of which Defendant transported him to the Macomb County Jail; however, Deputy Onyski stated that he transported Plaintiff. (*See* Onyski Dep. at 5). Deputy Onyski denies ever hearing Plaintiff complain of stomach pain. (*See id.* at 28).

happened to which he replied that his stomach hurt and he needed help. (*See id.* at 30-31). Onyski then asked Plaintiff if he would submit to a Breathalyzer test, which Plaintiff did. (*See* Onyski Dep. at 7).

After Plaintiff consented to the Breathalyzer, the booking officer took him to an observation cell and Onyski left Plaintiff's presence in order to complete a report of the night's activity. (*See* Onyski Dep. at 7-9). In order to properly administer the Breathalyzer, the operator was required to wait for a period of fifteen minutes before giving Plaintiff the test. (*See id.*). However, Plaintiff vomited while waiting for the Breathalyzer, necessitating a longer wait. (*See id.*). According to Onyski, the entire process took approximately one hour, of which he was in Plaintiff's presence for approximately ten to fifteen minutes. (*See id.*). There is no dispute that Plaintiff had no contact with Deputy Onyski after he turned Plaintiff over to the booking officer. The results of the Breathalyzer revealed that Plaintiff had a blood alcohol content of .21, nearly three times the legal limit. (*See id.* at 30).

After his Breathalyzer test, Plaintiff was escorted to a holding cell.[5] (*See* Pl.'s Dep. at 31-32). On the way to the cell, Plaintiff told an unidentified female corrections officer that his stomach hurt and he needed help. (*See id.* at 33-34). Plaintiff was then placed in a cell with a glass door. (*See id.* at 36, 76). Plaintiff stated that slept off and on for approximately ten hours. (*See id.* at 37). While he was awake, however, Plaintiff continually screamed for help due to his stomach pain. (*See id.*). Plaintiff states that the corrections officers who were present ignored his screams even though he

---

[5]Plaintiff initially stated that he was escorted to the cell by the officer who arrested him, but admitted that he was not really paying attention at the time. (*See* Pl.'s Dep. at 33).

4

could hear them speaking in the hallway outside his cell.[6] (*See id.* at 39-40). After being in the cell for approximately three hours, an unidentified corrections officer responded to Plaintiff's calls for help and a nurse arrived approximately one hour later.[7] (*See id.* at 37-40). According to Plaintiff, the nurse observed that he had vomited and had a bowel movement. (*See id.* at 42). Plaintiff told the nurse that his bladder hurt from being punched in the stomach. (*See id.* at 37-38). However, Plaintiff states that the nurse refused to treat him despite his pleas for help. (*See id.* at 41-44). The same nurse returned approximately two to three hours later but again refused to give Plaintiff assistance. (*See id.* at 42-43).

Finally, another nurse arrived at Plaintiff's cell with an unidentified corrections officer to take Plaintiff to the MCJ's medical center.[8] (*See id.* at 44). At the medical center, an unidentified doctor refused to immediately examine Plaintiff because, according to Plaintiff, he was crying uncontrollably. (*See id.* at 45-46). After calming down, the doctor gave Plaintiff a rectal exam and then placed him in a medical cell. (*See id* at 47-48).

After approximately one hour in the medical cell, Plaintiff's sister bonded him out and took him to Mt. Clemens General Hospital. (*See id.* at 48-49). At the hospital, Plaintiff received

---

[6]Interestingly, Plaintiff states that he was an acquaintance of one of the corrections officers at the MCJ and this officer did not respond when Plaintiff specifically asked him for help. (*See* Pl.'s Dep. at 69-70).

[7]Plaintiff's estimates concerning the length of his stay in the MCJ and the time between visits from corrections officers are inconsistent. Initially, Plaintiff stated that the nurse arrived after nine hours of being in the cell. (*See* Pl.'s Dep. at 37-38). He later stated that she arrived after approximately four hours. (*See id.* at 39-40).

[8]Plaintiff stated that this occurred fourteen to sixteen hours after the first nurse made her second visit, which, according to Plaintiff, occurred at least six hours after he arrived at the MCJ. (*See* Pl.'s Dep. at 44). However, there is no dispute that Plaintiff's total stay at the jail did not exceed eighteen hours.

5

immediate medical treatment and was taken into emergency surgery. (*See id.* at 49). The surgery, which was performed on November 10, 2005, revealed that Plaintiff's bladder had been perforated. (*See* Pl.'s Ex. F). Plaintiff was released from the hospital on November 16, 2005.

### III. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. PRO. 56(c); *accord Turner v. City of Taylor*, 412 F.3d 629, 637 (6th Cir. 2005). When deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A genuine issue of material fact exists when there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

### IV. ANALYSIS

**A. Plaintiff's Claim Against Macomb County**

Defendants have moved for summary judgment as to Plaintiff's claim against Macomb County[9] arguing that Plaintiff has not shown that Macomb County had a custom or policy that caused any alleged constitutional violation. *See Monell v. Dep't of Social Services*, 436 U.S. 658

---

[9] Although Defendant seeks dismissal of Plaintiff's claims against Deputies Onyski and Stone in their official capacities, a claim against a government official in his official capacity is in reality a claim against the government entity itself. Accordingly, Plaintiff's claims against the individual defendants in their official capacities are simply claims against Macomb County.

(1978) (holding that a municipality cannot be liable for a violation of 1983 based on respodeat superior and requiring that there be an official policy or custom in order to hold a municipality liable). In his response to Defendants' motion, Plaintiff admits that he has not shown an official policy or custom and concedes that Defendants are entitled to summary judgment as to Plaintiff's excessive force and deliberate indifference claims against Macomb County. Therefore, Defendants' motion is granted as to these issues.

**B. Plaintiff's Deliberate Indifference Claim Against Deputies Onyski and Stone**

Plaintiff's claim that Defendants Onyski and Stone were deliberately indifferent to his serious medical condition. Defendants argue that they are entitled to qualified immunity.

Qualified immunity is an affirmative defense that protects government officials "from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "There are two steps in the analysis: (1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005). Thus, the Court must first determine whether, assuming Plaintiff's allegations are established, his constitutional rights have been violated.

Pretrial detainees have a right under the Fourteenth Amendment's due process clause to adequate medical treatment similar to the right of prisoners under the Eighth Amendment. *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001). "To sustain a cause of action under § 1983 for failure to provide medical treatment, plaintiff must establish that the defendants acted with 'deliberate indifference to serious medical needs.'" *Id.* at 686 (quoting *Estelle v. Gamble*, 429

7

U.S. 97, 104 (1976)). The detainee's claim consists of an objective and a subjective component. *Carter*, 408 F.3d at 311. The objective component requires the detainee to demonstrate that a serious medical need existed. *Id.* The subjective component requires a showing that the defendant possessed "a sufficiently culpable state of mind in denying medical care." *Id.* (quoting *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004)).

The Court finds that Defendants Onyski and Stone are entitled to qualified immunity in the present case because, assuming Plaintiff's medical need was sufficiently serious, he has not presented evidence that Defendants possessed a sufficiently culpable state of mind. "A defendant possesses a sufficiently culpable state of mind when he acts with deliberate indifference." *Carter*, 408 F.3d at 312. "Deliberate indifference is not mere negligence" but "requires that the defendants knew of and disregarded a substantial risk of serious harm to [Plaintiff]'s health and safety." *Watkins*, 273 F.3d at 686. This is a subjective standard and Plaintiff cannot demonstrate deliberate indifference by showing that "there was a danger of which an officer should objectively have been aware." *Id.* Rather, "the official must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Finally, "[t]his subjective component must be addressed for each [Defendant] individually." *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005).

In *Garretson*, the court found that the plaintiff had presented sufficient evidence to show that two of the defendants were deliberately indifferent to her serious medical condition but insufficient evidence as to the remaining two defendants. The plaintiff in *Garretson* alleged that the two officers who arrested her, along with a detective who interviewed her the following day and an unidentified

8

officer, were deliberately indifferent to her serious medical condition. *Id.* at 795. While she was being booked by one of the two arresting officers, the plaintiff told the officer that she was diabetic and was late for her current dose of insulin. *Id.* at 794. The plaintiff also specifically asked if it would be possible to be transferred to a facility where she could get insulin. *Id.* The plaintiff then described her situation in detail to the unidentified officer. *Id.* Throughout the night, the plaintiff displayed symptoms of insulin deprivation and high blood sugar, and repeatedly knocked on the cell door for assistance. *Id.* The next morning the plaintiff was interviewed by a detective and told him of her condition. *Id.* Plaintiff was not displaying any symptoms of insulin deprivation at this time. *Id.* The detective arranged for the plaintiff to receive treatment after the interview. *Id.*

In discussing the defendants' qualified immunity defense, the court found that the plaintiff produced sufficient evidence that both the unidentified officer and the officer that booked her knew of facts from which they could infer she was in substantial risk of harm. *Id.* at 798. Specifically, these officers knew that plaintiff was diabetic and insulin dependent, that she was late for her insulin treatment, and that she needed insulin at the time she was brought to the jail. *Id. See also Carter*, 408 F.3d at 312-13 (concluding the defendant was aware of facts that would lead him to infer the plaintiff was in substantial risk of harm where he personally knew that the plaintiff displayed the classic signs of a heart attack, i.e. shortness of breath and chest pains, was three days behind on her "heart" medication, and cried loudly complaining of chest pains for the entire time the defendant was at the jail); *Blackmore*, 390 F.3d at 896 (same, where the defendant knew that the plaintiff was experiencing the classic signs of appendicitis, i.e. sharp abdominal pains and vomiting, knew that antacids did not alleviate the plaintiff's abdominal pain, and the plaintiff complained of severe abdominal pain constantly for over fifty hours).

In contrast, the court concluded that the arresting officer who was not present when the plaintiff was booked and the detective who interviewed her were not aware of facts from which they could infer she was in a substantial risk of harm. *Id.* at 797. With respect to the arresting officer, the court found that since he was not present at the booking, he had no knowledge of her diabetic condition or need for insulin. *Id.* As for the detective, the court concluded that since he had no knowledge of the plaintiff's condition prior to the interview and the plaintiff was not showing signs that she needed insulin immediately, he was not aware of facts that would lead him to conclude she was in substantial risk of harm. *Id. See also Watkins*, 273 F.3d at 686 (concluding the defendants were not aware of facts from which they could infer the plaintiff was in substantial risk of harm from swallowing cocaine where none of the officers saw the plaintiff swallow drugs, he consistently denied doing so, he appeared drunk and high, and he complained of stomach pains).

In the present case, Plaintiff has not presented any evidence that either individual Defendant acted with deliberate indifference to Plaintiff's serious medical condition. In order to make this showing, Plaintiff must present evidence that each Defendant knew of facts from which they could infer he was in substantial risk of harm if not given medical care. In addition to this showing, Plaintiff must demonstrate that each defendant actually made this inference. The Court will discuss each defendant individually.

Beyond the fact that Deputy Stone was present at the scene of Plaintiff's arrest, the record contains absolutely no evidence that he knew Plaintiff was in pain or that he disregarded any risk of harm to Plaintiff. Following Plaintiff's arrest, Deputy Onyski and Deputy Stone each went into their separate patrol cars and left the scene: Onyski drove with Plaintiff to the MCJ and Stone either remained at the scene of arrest to await a tow truck or went on further patrol. Similar to the second

arresting officer in *Garretson*, there is no dispute that Deputy Stone had no contact with Plaintiff after Deputy Onyski left the scene of arrest. Likewise, there is also no dispute that Deputy Stone, as in *Garretson*, was not aware of any facts surrounding Plaintiff's condition until Plaintiff commenced the present suit. The first time Plaintiff complained of any pain was while he was being transported to the MCJ by Deputy Onyski and the record is clear that Deputy Stone was not present at this time. As a result, Plaintiff cannot show that Deputy Stone was aware of facts that would have led him to infer Plaintiff was in a serious risk of harm. Consequently, like the plaintiff in *Garretson*, Plaintiff cannot possibly demonstrate that Deputy Stone actually made this inference and then deliberately disregarded it. Therefore, Deputy Stone is entitled to qualified immunity and is entitled to summary judgment as to Plaintiff's deliberate indifference claim.

There is slightly more evidence with respect to Deputy Onyski. Plaintiff told Onyski on the way to the MCJ that his stomach hurt and he needed help. Additionally, Plaintiff told the booking officer in Onyski's presence that his stomach hurt and he needed help. Finally, although Onyski was not in Plaintiff's presence after he was taken for the Breathalyzer test, Onyski became aware that Plaintiff vomited prior to taking the Breathalyzer.

The Court finds that Plaintiff's evidence is not sufficient to demonstrate that Deputy Onyski was aware of facts from which he could infer that Plaintiff was in substantial risk of harm. At most, Plaintiff stated that his stomach hurt in Officer Onyski's presence three times: first, in the Sheriff's vehicle on the way to the jail; second, upon entering the booking area at the jail; and third, in response to a question from the booking officer at the jail. There is no dispute that Deputy Onyski had no further contact with Plaintiff after he turned custody over to the booking officer. In total, Deputy Onyski was in Plaintiff's presence for ten to fifteen minutes at the jail. Aside from Plaintiff's

11

verbal complaints, the only other evidence that would have led Deputy Onyski to infer that Plaintiff was in serious danger was the fact that Plaintiff vomited.

While the record indicates that Onyski was aware that Plaintiff vomited, this fact, even when combined with stomach pain, is just as, if not more, consistent with being intoxicated than having a perforated bladder. *See*, *e.g.*, *Watkins*, 273 F.3d at 686 (finding the fact that the plaintiff's condition could have been attributable to non-life threatening causes to be a factor in assessing whether the defendants were aware of facts that would have permitted an inference of a substantial risk of harm). Therefore, unlike *Carter* and *Blackmore*, Plaintiff's symptoms cannot be considered classic signs of a serious medical condition such that Deputy Onyski would have inferred Plaintiff was in substantial risk of serious harm. Moreover, Deputy Onyski was only in Plaintiff's presence at the MCJ for ten to fifteen minutes, unlike *Carter* and *Blackmore* where the defendants were aware of the plaintiffs' constant complaints for extended periods of time. Further, similar to the situation in *Garretson* where the plaintiff displayed no symptoms of insulin deprivation during her interview, Deputy Onyski conducted a full pat down search in the garage of the MCJ during which Plaintiff made no complaints of pain or discomfort. Thus, from Deputy Onyski's perspective, Plaintiff was not displaying the constant pain or outward physical signs of a serious medical condition that led the courts in *Carter* and *Blackmore* to conclude the defendants were deliberately indifferent to the plaintiffs serious medical conditions.

Finally, even if the Court were to find that Deputy Onyski was aware of facts that could have led him to infer Plaintiff was in need of immediate medical attention, Plaintiff's evidence with respect to Deputy Onyski is not strong enough to show that *he* actually drew this inference and deliberately disregarded it. *See Carter*, 408 F.3d at 313 (noting that "a genuine issue of material fact

as to deliberate indifference can be based on a strong showing of [a serious medical need]"). Therefore, Deputy Onyski is entitled to qualified immunity and is entitled to summary judgment as to Plaintiff's deliberate indifference claim.

## V. CONCLUSION

As Plaintiff has conceded that he cannot demonstrate an official policy or custom sufficient to impose liability on a municipality, Defendant Macomb County is entitled to summary judgment as to Plaintiff's excessive force and deliberate indifference claims. Furthermore, the Court concludes that Deputies Onyski and Stone are entitled to qualified immunity as to Plaintiff's deliberate indifference claim. Accordingly, IT IS ORDERED that Defendants' Motion for Partial Summary Judgement is GRANTED.

In addition, the Court finds that Plaintiff's Fourth Amendment excessive force claim against Defendants Onyski and Stone in their individual capacities, which was not addressed in the current motion, may be ripe for review. Therefore, the parties are HEREBY ORDERED to submit briefs and any and all evidence pertaining to this issue by 12:00 p.m. on August 17, 2007. The briefs shall be limited to 20 pages. The parties shall then file any responsive briefs by 5:00 p.m. on August 24, 2007, which shall be limited to 10 pages. There will be no reply briefs permitted.

IT IS SO ORDERED.

s/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated: July 24, 2007

CERTIFICATE OF SERVICE

      The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on July 24, 2007.

s/Marie E. Verlinde<br>
Case Manager<br>
(810) 984-3290